HAAS PUBLISHING COMPANY,
Petitioner,

v.

INDIANA DEPARTMENT OF STATE
REVENUE, Respondent.

No. 49T10–0309–TA–47.

Tax Court of Indiana.

Oct. 6, 2005.

Larry J. Stroble, Randal J. Kaltenmark, Dana L. Luetzelschwab, Barnes & Thornburg LLP, Indianapolis, for Petitioner.

Steve Carter, Attorney General of Indiana, John D. Snethen, Deputy Attorney General, Indianapolis, for Respondent.

FISHER, J.

Haas Publishing Company (Haas) appeals the final determination of the Indiana Department of State Revenue (Department) assessing it with use tax for the 1998, 1999, and 2000 tax years (the years at issue). The issue for this Court to decide is whether Haas's publications are free distribution newspapers thereby making its production costs exempt from the use tax pursuant to Indiana Code § 6–2.5–5–31.

## FACTS AND PROCEDURAL HISTORY

Haas is a Delaware corporation with its principal place of business in New York, New York. During the years at issue, Haas published and distributed free-of-charge apartment guides for major metropolitan

areas throughout the United States. Two of the apartment guides published by Haas are the subjects of this appeal: *The Greater Indianapolis Apartment Guide* and *The Greater Indianapolis Apartment Renter's Guidebook* (the Apartment Guides).

The Apartment Guides were placed in open racks or newspaper dispensers where members of the general public could take copies free of charge. These racks and dispensers were located in grocery stores, pharmacies, convenience and other types of stores, banks, colleges, public libraries, major local employers' facilities, airports, and on streets throughout the areas covered by the Apartment Guides.

During the years at issue, the Apartment Guides were published once a month. They retained the same title from month to month and consistent content with regard to layout, graphics, and the general nature of the information provided. Each issue of the Apartment Guides contained advertisements from numerous advertisers.

In 2002, the Department conducted an audit of Haas and determined that it owed Indiana use tax on the cost of printing, labor, equipment and materials utilized in the production of the Apartment Guides during the years at issue (production costs). The Department subsequently issued proposed assessments against Haas in the amount of $77,818.79, plus penalties and interest.[1]

Haas protested the assessments, claiming that its production costs qualify for exemption pursuant to Indiana Code § 6-2.5-5-31 because they were incurred in the production of a free distribution newspaper. An administrative hearing was held and, on March 20, 2003, the Department issued a Letter of Findings (LOF) denying Haas's protest.

On September 15, 2003, Haas initiated an original tax appeal. The parties stipulated to the facts and evidence in this case and requested that, in lieu of a trial, the case be decided on the record. The Court heard the parties' oral arguments on July 8, 2005. Additional facts will be provided as necessary.

## ANALYSIS AND OPINION

### Standard of Review

■ This Court reviews final determinations of the Department *de novo*. Ind. Code Ann. § 6-8.1-5-1(h) (West Supp. 2004–2005). Accordingly, it is bound by neither the evidence nor the issues presented at the administrative level. *Snyder v. Indiana Dep't of State Revenue*, 723 N.E.2d 487, 488 (Ind. Tax Ct.2000), *review denied*.

■ When a taxpayer claims entitlement to a tax exemption, the taxpayer bears the burden of showing that the terms of the exemption are met. *North Central Indus., Inc. v. Indiana Dep't of State Revenue*, 790 N.E.2d 198, 200 (Ind. Tax Ct.2003) (citation omitted). While this Court strictly construes an exemption against the taxpayer, it will not read it so narrowly as to defeat its application to cases rightly within its ambit. *Id.* (citation omitted).

### Discussion

Indiana imposes a state gross retail tax (sales tax) on "retail transactions made in Indiana." Ind. Code Ann. § 6-2.5-2-1(a) (West 1998). Indiana also imposes a use tax—which is the functional equivalent of

---

1. The total assessment against Haas was $111,028.25; however, $33,209.46 of that amount, which related to other apartment guides Haas published in Indiana, is not at issue here. (*See* First Stip. ¶ 6; Second Stip. ¶¶ 1–2.)

the sales tax—on the use or consumption of certain non-exempt tangible personal property that has escaped sales tax, usually because the property was acquired in a transaction that occurred outside of Indiana. *See* IND. CODE ANN. § 6–2.5–3–2(a) (West 1998). *See also Rhoade v. Indiana Dep't of State Revenue*, 774 N.E.2d 1044, 1047–48 (Ind. Tax Ct.2002).

■ Indiana Code § 6–2.5–5–31 exempts from the sales and use tax[2] production costs incurred in the publication of free distribution newspapers.[3] A free distribution newspaper is defined as:

any community newspaper, shopping paper, shoppers' consumer paper, pennysaver, shopping guide, town crier, dollar stretcher, or other similar publication which:

(1) is distributed to the public on a community-wide basis, free of charge;

(2) is published at stated intervals of at least once a month;

(3) has continuity as to title and general nature of content from issue to issue;

(4) does not constitute a book, either singly or when successive issues are put together;

(5) contains advertisements from numerous unrelated advertisers in each issue;

(6) contains news of general or community interest, community notices, or editorial commentary by different authors, in each issue; and

(7) is not owned by, or under the control of, the owners or lessees of a shopping center, a merchant's association, or a business that sells property or services (other than advertising) whose advertisements for their sales of property or services constitute the predominant advertising in the publication.

IND. CODE ANN. § 6–2.5–5–31(a) (West 1998). The term "free distribution newspaper" does not, however, include "mail order catalogs or other catalogs, advertising fliers, travel brochures, house organs, theater programs, telephone directories, restaurant guides, shopping center advertising sheets, and similar publications." A.I.C. § 6–2.5–5–31(b).

Haas argues that because its Apartment Guides are free distribution newspapers, its production costs are therefore exempt from use tax. The Department, on the other hand, maintains that the Apartment Guides are not free distribution newspapers because they fail to meet three of the criteria listed in § 6–2.5–5–31(a). Specifically, the Department argues that the Apartment Guides are books, that the advertisers in the Apartment Guides are related, and that the Apartment Guides do not publish community notices. (*See* Resp't Resp. Br. at 10, 14–15.) *See also* A.I.C. § 6–2.5–5–31(a)(4)–(6). The Court will address each of the Department's contentions in turn.

---

2. Indiana Code § 6–2.5–5–31 provides an exemption from the sales tax only. Nevertheless, tangible personal property is exempted from the use tax if the property was acquired in a transaction that is exempt from the sales tax under any part of Indiana Code § 6–2.5–5. *See* IND. CODE ANN. § 6–2.5–3–4(a)(2) (West 1998).

3. Specifically, Indiana Code §§ 6–2.5–5–31(c) and (d) provide exemptions for equipment and other tangible personal property directly used or consumed in the direct production or publication of a free distribution newspaper, and for the purchase of printing services by the publisher of a free distribution newspaper. IND. CODE ANN. § 6–2.5–5–31(c)–(d) (West 1998).

*I. Are the Apartment Guides Books?*

Indiana Code § 6–2.5–5–31 states that in order to qualify as a free distribution newspaper, a publication must "not constitute a book, either singly or when successive issues are put together[.]" A.I.C. § 6–2.5–5–31(a)(4). The Department argues that the Apartment Guides do not qualify for the exemption because they are books, not newspapers. (Resp't Resp. Br. at 11.) This argument, however, stems from a faulty proposition: that in order to qualify as a free distribution newspaper, a publication must be a newspaper (as that term is commonly understood). The Court must first address this preliminary issue before turning its attention to the question of whether the Apartment Guides are books.

The Department reads § 6–2.5–5–31 as having two distinct requirements for exemption: 1) that the publication be distributed free of charge, and 2) that the publication be a newspaper. (*See* Resp't Resp. Br. at 7.) Because the legislature has not specifically defined the term "newspaper" in § 6–2.5–5–31, the Department argues that the "Plain Meaning Rule" should apply, and the Court should interpret the statute based on the common, ordinary understanding of the word "newspaper." (*See* Oral Argument Tr. at 21–22.) *See also LDI Mfg. Co. v. State Bd. of Tax Comm'rs*, 759 N.E.2d 685, 689 (Ind. Tax Ct.2001) (providing that where the legislature has not defined terms used in a statute, they are to be given their plain and ordinary meaning). The Department's reading of this statute misses the mark.

Section 6–2.5–5–31 was not intended to exempt only newspapers that are distributed free of charge; rather, it was intended to create a whole new category of exempt publications. While this category does include news-oriented publications, it also includes publications that would not normally be considered "newspapers" as that term is commonly understood. Indeed, the examples of free distribution newspapers listed in the statute include a number of advertising-oriented publications, such as "shopping paper[s], shoppers' consumer paper[s], pennysaver[s], shopping guide[s], [and] dollar stretcher[s.]" A.I.C. § 6–2.5–5–31(a). Accordingly, rather than defining the term "newspaper" for purposes of this statute, the legislature instead defined "free distribution newspaper." In fact, the legislature set forth very specific criteria that a publication must meet in order to qualify as a free distribution newspaper. Nowhere in the statute, however, did the legislature state that a publication must be commonly understood to be a newspaper in order to qualify as a free distribution newspaper.[4] *See* A.I.C. § 6–2.5–5–31 (footnote added).

This Court has often stated that what a statute does *not* say is just as important as what it does say. *Hoosier Energy Rural Elec. Coop., Inc. v. Dep't of Local Gov't Fin.*, 820 N.E.2d 787, 791 (Ind. Tax Ct.2004) (emphasis added) (citations omitted). If the legislature had intended for the commonly understood definition of a newspaper to prevail, it would have stated as much. It also would not have provided the other specific criteria listed in the statute. Thus, it is not the case that a free distribution newspaper must also fit the commonly understood definition of a newspaper in order to qualify for exemption.

With this matter clarified, the Court now turns its attention to the question of

---

4. Nor has the Department ever previously interpreted the statute in this manner. *Compare with* Ind. Admin. Code tit. 45, r. 2.2–5–26 (1996) (for purposes of the newspaper exemp-

tion provided by Indiana Code § 6–2.5–5–17, the term "newspaper" means, among other things, a publication which is "commonly understood to be [a] newspaper[ ]").

whether the Apartment Guides constitute books. Unlike the term "free distribution newspaper" which was very clearly defined by the legislature, there is no definition provided for the term "book" in Indiana Code § 6–2.5–5–31. Therefore, the Court will look to the common and ordinary meaning of that word for guidance.

The Department relies on the definition provided by the American Heritage Dictionary, which states that a book is " 'a set of written, printed, or blank pages fastened along one side and encased between protective covers.' " (*See* Oral Argument Tr. at 24.) *See also* AMERICAN HERITAGE DICTIONARY OF THE ENGLISH LANGUAGE (4th ed.2000), *available at* http://www. bartleby.com/61. Webster's Dictionary provides a somewhat different definition, stating that a book is "a collection of written, printed, or blank sheets fastened together along one edge and [ ] trimmed at the other edges to form a single series of uniform leaves; specif[ically]: a collection of folded sheets bearing printing or writing that have been cut, sewn, and [ ] bound between covers into a volume." WEBSTER'S THIRD NEW INT'L DICTIONARY 252 (3d ed.1981). The Cambridge Dictionary offers yet another variation, defining a book as "an object consisting of a number of pages of text or pictures fastened together along one edge and fixed inside two covers." CAMBRIDGE DICTIONARY OF AMERICAN ENGLISH, *available at* http://www. dictionary. cambridge.org.

While these definitions provide a useful starting point, they do not yield a definitive understanding of what constitutes a book. Indeed, each definition provides slightly different criteria. Webster's, for example, states that the pages must be sewn; however, the other definitions do not include this criterion. In addition, the American Heritage definition states that the covers must be "protective." Once again, this requirement is not found in the other definitions. Finally, it is not clear whether the pages must be "bound" together or "fastened" together; Webster's Dictionary uses both terms, while the other two dictionaries only use the term "fastened."

Although these may appear to be minor variations, they have significant consequences when applied to the facts of this case. Indeed, under the Cambridge Dictionary definition, the Apartment Guides would be considered books—they are pages of text fastened together between two covers. Under Webster's definition, however, they would not qualify as books because their pages are not sewn together; rather, they are bound together with glue. Furthermore, the American Heritage definition may or may not classify the Apartment Guides as books because it is unclear what constitutes a "protective" cover. The covers of the Apartment Guides are a slightly heavier weight than the internal pages; nonetheless, they would seem to offer a minimal amount of "protection."

Because these definitions do not provide clear guidelines for discerning what constitutes a book, the Court turns to case law existing at the time of the statute's enactment for further guidance. In *Smith v. Hitchcock*, the United States Supreme Court described a book as follows: "[w]ithout attempting a definition, we may say that generally a printed publication is a book when its contents are complete in themselves, deal with a single subject, betray no need of continuation, and, perhaps, have an appreciable size." *Smith v. Hitchcock*, 226 U.S. 53, 59–60, 33 S.Ct. 6, 57 L.Ed. 119 (1912). Other cases have emphasized two major features that distinguish books from periodicals: (1) periodicals are usually incomplete in themselves; and (2) periodicals demonstrate continuity between each issue. *See Inst. for Scienti-*

*fic Info., Inc. v. United States Postal Serv.,* 555 F.2d 128, 131 (3d Cir.1977); *Commonwealth v. Zone Book, Inc.,* 372 Mass. 366, 361 N.E.2d 1239, 1242 (1977). The distinction between books and periodicals has also been applied to "shoppers . . . [which] are published at regular intervals but contain little or no material other than advertising." *Shop and Swap Advertiser, Inc. v. Oklahoma Tax Comm'n,* 774 P.2d 1058, 1060 (Okla.1989). The court in that case held that the term "periodical," for purposes of an Oklahoma sales tax exemption, included regularly published issues of shoppers, even if their only content is advertising. *See id.* at 1062.

Based on the dictionary definitions as well as relevant case law existing at the time of the statute's enactment, the Court concludes that the Apartment Guides do not constitute books within the meaning of Indiana Code § 6–2.5–5–31. The contents of the Apartment Guides are not complete in themselves. The Apartment Guides, by their very nature, are intended to be ongoing publications that provide continually updated information for apartment shoppers in the community. Even if successive issues of the Apartment Guides were put together, they would still fail to comprise a publication that is complete in itself. *See* A.I.C. § 6–2.5–5–31(a)(4) (requiring that a free distribution newspaper must not constitute a book, "either singly or when successive issues are put together"). There would still be no definitive beginning or end to the series, as the guides could, conceivably, be published in perpetuity as

long as there is an apartment market. Accordingly, the Apartment Guides are not books, as that term is commonly and ordinarily understood.[5]

## II. Are the Advertisers in the Apartment Guides Related?

Indiana Code § 6–2.5–5–31 also provides that the exemption applies when a publication "contains advertisements from numerous unrelated advertisers in each issue." A.I.C. § 6–2.5–5–31(a)(5). The parties have stipulated that the Apartment Guides "contained advertisements from numerous different advertisers in each issue[,] [m]ost [of whom] were not under common ownership." (First Stip. of Facts at 3, ¶ 12.) Nevertheless, the Department claims that the Apartment Guides' advertisers are related because: (1) they advertise the same good (rental property); (2) they appear in the official publication of the Apartment Association of Indiana (AAI); (3) of the top twenty advertisers (who consume more than forty percent of the available ad space in the Apartment Guides), nineteen advertisers manage AAI member properties, are winners of AAI's Prodigy Award, or both; and (4) information about each advertiser can be accessed through the same twenty-four-hour toll-free information line. (*See* Resp't Resp. Br. at 14–15.) While these factors show some common threads existing among the advertisers, they do *not* indicate the kind of relationship between the advertisers that is con-

---

5. The Department points out that Haas refers to the Apartment Guides as books. (*See* Stip. Ex. 1 at 7 and Stip. Ex. 2 at 7(stating that "[t]his *book* or parts thereof must not be reproduced in any form without permission in writing from the publisher" and "[t]he cover, cover design and format of this *book* are a trademark of Haas Publishing Companies, Inc.")· (emphases added).) Nevertheless, Haas's tax manager, Beverly A. Paley, has

testified that "Haas use[s] the term 'book' to refer to all of its publications, irrespective of their nature, content, manner of binding, or frequency of publication." (First Stip. to the Admission of Written Statements in Lieu of Oral Testimony at 2, ¶ 6.) Moreover, the relevant issue is not what Haas called its publications, but rather, what the legislature intended when it used the term "book."

templated by Indiana Code § 6–2.5–5–31(a)(5).

To begin with, the statute requires that the *advertisers* be unrelated, not that the *advertising* itself be unrelated. *See* A.I.C. § 6–2.5–5–31(a)(5). Therefore, it is of no consequence that the advertisers in the Apartment Guides are all advertising the same good. Moreover, the other factors cited by the Department are merely a result of the Department's desperate search for any commonalities existing between the advertisers. This approach to determining whether advertisers are related is unworkable, as it would exclude from exemption any publication whose advertisers belong to a common class or group. For example, if, as the Department suggests, membership in the same trade association means that advertisers are related, then any advertisers belonging to the same local, state, or national Chamber of Commerce would be considered related. Advertisers could also be considered related if they hail from the same geographic location or target the same demographic. This cannot have been what the legislature intended.

Instead, as Haas correctly posits, subsection (5) of Indiana Code § 6–2.5–5–31 was intended "to ensure that a qualifying free distribution newspaper is not dominated by a single advertiser or by commonly owned advertisers that can act effectively as one advertiser by virtue of affiliated ownership and control." (Pet'r Reply Br. at 8.) The statute, as a whole, was intended to exempt free distribution newspapers that were open to a multiplicity of advertisers, as opposed to in-house publications that one company might produce for itself or for its sister companies. *See* A.I.C. § 6–2.5–5–31(b) (stating that the term "free distribution newspaper" does not include, among other things, house organs). Accordingly, advertisers

may only be considered "related" for purposes of § 6–2.5–5–31(a)(5) if they are under common ownership or control. The parties have stipulated that most of the Apartment Guides' advertisers are not under common ownership; therefore, they are not related. (First Stip. of Facts at 3, ¶ 12.)

### III. Do the Apartment Guides Publish Community Notices?

The final issue contested by the Department is whether the Apartment Guides publish community notices. Section 6–2.5–5–31(a)(6) provides that in order to qualify for the exemption, a publication must "contain[ ] news of general or community interest, community notices, or editorial commentary by different authors, in each issue[.]" A.I.C. § 6–2.5–5–31(a)(6). Haas explains that there are several examples of community notices in the Apartment Guides, including:

bulletins concerning personal identification needed to tour apartments; an [AAI] calendar of events; a welcoming letter from the [AAI]; maps of the area; information for newcomers to the city including names and telephone numbers for transportation services, sports teams, arts and entertainment activities, utility companies and other service providers; notices concerning apartment accommodations for persons with wheelchair disabilities; information concerning area climate and statistical information, libraries, radio and television stations, voter registration, and license branches; and announcements concerning the [AAI]'s exposition and conference.

(Pet'r Br. at 12–13.) The Department argues, however, that these examples do not represent the type of notice contemplated by § 6–2.5–5–31(a)(6). Instead, according to the Department, "the phrase 'communi-

ty notices' must be ordinarily understood to mean publication of those things about which the law entitles a community to know." (Resp't Resp. Br. at 17.) In other words, the Department equates community notice with legal notice.

To support its claim, the Department relies on Indiana Code § 5–3–1–0.7 which delineates what publications are qualified to carry legal notice. Political subdivisions are generally required to publish legal notice in two newspapers published within the boundaries of the political subdivision. *See* IND. CODE ANN. § 5–3–1–4(a) (West 1998). They may also, in their discretion, publish public notice in other qualified publications or in additional newspapers in order to provide supplementary notification. *See* A.I.C. § 5–3–1–4(f). In defining what constitutes a "qualified publication," the legislature utilized some of the same criteria found in Indiana Code § 6–2.5–5–31.[6] Specifically, § 5–3–1–0.7 provides that a qualified publication must "contain[ ] news of general or community interest, community notices, or editorial commentary." IND. CODE ANN. § 5–3–1–0.7 (West 1998). The Department, therefore, argues that because the two statutes deal with similar subjects, are aimed at similar purposes, and use identical language, they should be read *in pari materia* with one another. The Court disagrees.

To begin with, § 6–2.5–5–31 predates § 5–3–1–0.7 by nearly 14 years. The latter statute, which expanded the legal notice statutes to allow publication in other "qualified publications" beyond newspapers, was adopted by the legislature in 1995. The fact that the legislature borrowed language from § 6–2.5–5–31 when enacting § 5–3–1–0.7 does nothing to explain the legislature's intent when it adopted § 6–2.5–5–31 in 1981.

Furthermore, although the legislature utilized some of the same criteria in defining qualified publications and free distribution newspapers, not all of the criteria are identical. For example, in order to be a publication qualified to carry legal notice, a publication must be published no less than tri-weekly, must have not more than 75% advertising content in half of its issues in each twelve month period, must have a local office, and must be entered, authorized and accepted by the United States Postal Service as standard mail (A) class. *See* A.I.C. § 5–3–1–0.7. These criteria are not found in § 6–2.5–5–31. As Haas correctly points out, "[i]t would have been illogical for the legislature to grant a sales tax exemption to a class of publications which could not qualify to carry legal advertising but to then withhold the exemption to those publications because the notices they publish are not legal advertising." (Pet'r Reply Br. at 12.)

Finally, there is simply nothing in either statute to indicate that the legislature intended to equate community notice with legal notice. If the legislature had intended to restrict the free distribution newspaper exemption to only those publications authorized to carry legal notice, the Court must presume that it would have said so. *See Hoosier Energy*, 820 N.E.2d at 791 (citations omitted).

Instead, the term "community notice" must be given its plain and ordinary meaning since it is not specifically defined by the statute. *See LDI Mfg. Co.*, 759 N.E.2d at 689. Webster's Dictionary defines "notice" as a "warning or intimation of something." WEBSTER'S THIRD NEW INT'L DICTIONARY 1544 (3d ed.1981). The examples of community notice cited by Haas clearly fit within this definition, as they intimate gen-

---

6. A "newspaper," for purposes of determining where legal notice may be published, is sepa-rately defined by Indiana Code § 5–3–1–0.4. *See* IND. CODE ANN. § 5–3–1–0.4 (West 1998).

eral information to apartment shoppers within the community. (*See* Pet'r Br. at 12–13). Accordingly, the Apartment Guides contain "community notices" within the meaning of Indiana Code § 6–2.5–5–31.[7]

### CONCLUSION

Haas has refuted the Department's claims that the Apartment Guides: (1) constitute books; (2) contain advertisements from related advertisers; and (3) do not contain community notices. Therefore, Haas has met its burden of proving that

the Apartment Guides are free distribution newspapers which qualify for exemption from the use tax as provided by Indiana Code § 6–2.5–5–31. For the foregoing reasons, the Court REVERSES the Department's final determination assessing Haas with use tax for the years at issue.

---

**7.** Any further evaluation of the newsworthiness or nature of the Apartment Guides' community notices would risk running afoul of the First Amendment to the United States Constitution and Article 1, § 9 of the Indiana Constitution. *See Emmis Publ'g Corp. v.*

*Indiana Dep't of State Revenue,* 612 N.E.2d 614, 622–23 (Ind. Tax Ct.1993) (holding that a regulation's criteria for determining whether a publication is a newspaper was unconstitutional where it discriminated on the basis of the content of the speech).